UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANTHONY THOMAS,                                    :

                   Petitioner,          :          **MEMORANDUM DECISION**

           - v -                              :          14-CV-0647 (DC)

THOMAS GRIFFIN,                                    :

                   Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:          ANTHONY THOMAS
                                 Petitioner *Pro Se*
                                 DIN 04-A-4062

                                 MELINDA KATZ, Esq.
                                 Queens County District Attorney
                                 By:     John M. Castellano, Esq.
                                            Sharon Y. Brodt, Esq.
                                            Assistant District Attorneys
                                 125-01 Queens Boulevard
                                 Kew Gardens, NY 11415
                                            Attorney for Respondent

CHIN, Circuit Judge:

        In 2002, following a jury trial, petitioner Anthony Thomas was convicted

in the Supreme Court of the State of New York, Queens County (Rosengarten, *J.*), of

attempted murder in the second degree, gang assault in the first degree, assault in the

first degree, burglary in the first degree, and three fourth-degree weapons counts. Dkt.

16 at 7-8. On July 26, 2004, Thomas was sentenced to determinate prison terms of a total

of twenty years as well as five years of post-release supervision. *Id.* at 11.[1] On August

8, 2012, the Appellate Division, Second Department, affirmed the convictions. *People v.*

*Thomas*, 949 N.Y.S.2d 634 (2d Dep't 2012). On January 24, 2013, leave to appeal to the

New York Court of Appeals was denied. *People v. Thomas*, 984 N.E.2d 333 (N.Y. 2013)

(Pigott, *J.*).

      In 2014, proceeding *pro se*, Thomas filed this habeas petition (the

"Petition") pursuant to 28 U.S.C. § 2254. Dkt. 1. The Queens County District Attorney's

Office filed its opposition on June 2, 2014. Dkt. 16. Thomas filed a traverse on June 25,

2014. Dkt. 18. The matter has remained fully submitted and undecided since then. The

case was reassigned to the undersigned on May 12, 2023. Dkt. Sheet at 4.

      For the reasons that follow, the Petition is DENIED.

## STATEMENT OF THE CASE

**A.**    ***The Facts***

      The evidence at trial established the following:

      On a daily basis for approximately two months prior to March 8, 2001,

Horace Jeridore sold crack cocaine in Queens for Thomas and his partner and co-

defendant Thomas Boone. Dkt. 14-2 at 153-55, 158. At trial, Jeridore identified Thomas

---

[1]    Thomas was conditionally released to parole custody on July 22, 2021. The maximum
expiration date of his supervision is June 7, 2023, and his post release supervision maximum
expiration date is September 22, 2024. *See* Incarcerated Lookup, Dep't of Corr. & Comm.
Supervision, https://nysdoccslookup.doccs.ny.gov/.

(referred to as "Tone") and Boone (referred to as "Ty") in the courtroom.  *Id*. at 154-55; Dkt. 14-3 at 8-9.

Around 5 p.m. on March 8, 2001, Jeridore was in his apartment on Shore Avenue in Queens when, as he testified, some "guys broke in . . . and started trying to beat me to death."  Dkt. 14-2 at 151-52.  At first four or five guys entered, including Thomas as well as Antoine Banks and Roshawn Battle, both of whom also lived in the building.  *Id*. at 152-53.  The men found Jeridore in the bathroom, pulled him out, and started assaulting him.  Dkt. 14-4 at 106-07, 111.  Thomas punched Jeridore in the head, telling Jeridore "to get dressed" and "get [your] ass out there to go to work."  Dkt. 14-2 at 155-56; *see also* Dkt. 14-3 at 6 (Thomas telling Jeridore "to get your clothes on and go outside and sell"); *id*. at 112-13 (Thomas saying "[g]et[] your ass dressed and get to work").  Thomas also yelled at Jeridore "go out and get [my] money" and "you [Jeridore] owe me $600," because Thomas had given Jeridore a "package," that is, drugs, to sell. Dkt. 14-3 at 113-15.  The attackers were cursing at Jeridore and asking him for the drugs they had given him to sell.  Dkt. 14-4 at 152-53.

The men slammed Jeridore to the ground, stomping him.  They taunted him with a knife, and threatened to stab and kill him.  Dkt. 14-2 at 156, 164.  At some point, Thomas left, only to return with four more guys, including Boone and Damian Banks (Antoine's brother who also lived in the building).  *Id*. at 157-58.  Boone hit Jeridore in the face with an ashtray.  *Id*. at 158.  Thomas grabbed a crowbar and Boone

3

grabbed a "mini bat," and they started hitting Jeridore, including in the head, thirty to forty times. *Id.* at 158-59. They threw things, such as shoes and videotapes, at him, and they took pliers and grabbed at his arm and leg with the pliers, ripping off the flesh. *Id.* at 162. Saying they "want[ed] to have fun with him," the attackers took salt and alcohol and poured it on his wounds. *Id.* at 164-65. One of the attackers (someone called "Mel") finally did stab Jeridore in the chest. *Id.* at 162, 166. When Jeridore pulled up his shirt, the others saw him bleeding and they scattered. *Id.* at 166. Jeridore knew all the individuals who attacked him; three were neighbors and one of the neighbors was also his cousin "through marriage." *Id.* at 152-53, 157-58; Dkt. 14-4 at 102. The assault lasted for over an hour. Dkt. 14-2 at 165.

The neighbor who lived upstairs in the building, Roshawn Battle, provided corroborating testimony at trial.[2] He testified that he saw four individuals go to Jeridore's apartment, which was in the basement of the building. Dkt. 14-4 at 99, 101-02. He heard "a whole lot of ruckus" and went down to find out what was going on, and he saw the four individuals "tearing up Horace's part of the location." *Id.* at 105. He decided to join in because Jeridore had his CD player and had failed to return it. *Id.* He participated in the assault on Jeridore. *Id.* at 105-06. He testified: "We came across Horace in the bathroom, and we all ganged up on him in the bathroom and started to

---

[2]     Battle had pleaded guilty to gang assault in the second degree and assault in the first degree and was testifying pursuant to a cooperation agreement. Dkt. 14-4 at 100-01.

4

jump him, kick him and punch him." *Id*. at 106.  He identified Thomas, Boone, Antoine

Banks, and Damian Banks as all participating in the beating.  *Id*. at 102, 106-07, 109.  He

saw the attackers use a tire iron (or crow bar), a baseball bat, and a knife, and he also

saw them pour salt and alcohol on Jeridore's wounds.  *Id*. at 108-10, 163-65.

Thomas finally let Jeridore go so that he could go to the hospital, but only

after telling Jeridore "you better tell the cops that you got jumped on the way home

from the train station."  Dkt. 14-2 at 167.  Jeridore then went to the hospital in a cab,

accompanied by Damian Banks.  *Id*. at 167-68.  Jeridore was treated at the hospital,

where he was "stitched up" and wounds in his head and stomach were stapled.  *Id*. at

169.  He received surgery the next day, March 9, 2001; the doctor who performed the

surgery described Jeridore's internal bleeding and the puncture wound to his liver.

Dkt. 14-3 at 137-38.  He also reviewed the surgical radiological reports and explained

that they showed that Jeridore had been hit many times in the head and had rib

fractures, injuries consisted with repeated blows by one or more blunt objects.  *Id*. at

143-45.

On March 13, 2001, while he was still in the hospital, Jeridore spoke to

Detective LoPresti and told him about the attack, identifying the eight individuals --

including "Tone" and "Ty" -- who had attacked him.  Dkt. 14-2 at 174-77; Dkt. 14-4 at 81-

82.  At some point, Jeridore told Detective LoPresti that Tone was a leader of the Crips

and that Boone was a member of the Crips.  Dkt. 14-3 at 19-21; Dkt. 14-4 at 40.

On March 20, 2001, which was about two days after he left the hospital, Jeridore met with Detective LoPresti so that his injuries could be photographed and he and the detective could go to a "stakeout." Dkt. 14-2 at 177; Dkt. 14-3 at 3-4; Dkt. 14-4 at 83-84. The jury was shown numerous photographs of Jeridore's injuries taken about a week after the attack, including photographs of his head with fifty staples in it, staples in his stomach, the injuries to his arm from the pliers, his bloodshot eye, and bruises on his back, arm, and leg. Dkt. 14-2 at 177-88; Dkt. 14-3 at 2-3; Dkt.14-4 at 82-83.

After the photographs were taken, Jeridore went with Detective LoPresti in an unmarked car and drove in the neighborhood, when they saw five of the individuals who had attacked him. Dkt. 14-2 at 177; Dkt. 14-3 at 3-4; Dkt. 14-4 at 83-84. Two ran away and a third went around the corner. Two -- Thomas and Boone -- remained where they were, standing about ten feet away. Jeridore told Detective LoPresti that they were "two of the guys that jumped me." Dkt. 14-3 at 3-7; *see* Dkt. 14-4 at 84. Detective LoPresti identified both Thomas and Boone in court as the two who remained. Dkt. 14-4 at 85. Detective LoPresti arrested both Thomas and Boone. *Id*. He also eventually arrested four of the other individuals involved in the attack. *Id.* at 86-87.

B.    *Procedural History*

1.    *State Court Proceedings*

a.    *The Trial Court*

Thomas and Boone were charged with attempted murder in the second degree, gang assault in the first and second degrees, assault in the first and second degrees, burglary in the first degree, and three counts of criminal possession of a weapon in the fourth degree.  Dkt. 16 at 7.

Trial commenced on July 16, 2002.  The prosecution called four witnesses: Jeridore, Battle, Detective LoPresti, and the doctor who performed the surgery.  The defense called a retired detective as an expert on gangs and gang affiliations, and recalled Detective LoPresti.  Dkt. 14-5 at 93, 96, 112.

When Battle took the stand, the prosecutor asked him whether, in addition to the terms of the guilty plea, he had "received any other type of promise or consideration from the Queens District Attorney's office."  Dkt. 14-4 at 101.  Battle responded: "The only thing I been promise was the safety of me and my family."  *Id*.  No objection was made at that time, but that afternoon Thomas's attorney moved for a mistrial on the grounds that the prosecution failed to produce anything, in response to a discovery order, regarding a promise of safety for Battle and his family and that the District Attorney's office had only produced the plea agreement and minutes of the plea allocution.  *Id*. at 101-02, 195-97; Dkt. 14-5 at 1.  The prosecutor responded by noting that

7

the "additional promise" had only been made the prior week when Thomas or "people at [his] behest" approached Battle's family, and that "prompted the District Attorney's [office] to do what they would do for any witness in any case, [] to offer or extend protection." Dkt. 14-5 at 2.  The court reserved decision.  *Id.* at 8.  Later that day, outside the presence of the jury, the court asked Battle when he was told that he and his family would be protected.  *Id.* at 67-68.  Battle responded that the prior week "individuals" had approached his brother and offered to pay Battle $3,000 not to appear in court.  *Id.* at 68.  At that point, Battle told the prosecutor what had happened and that he was afraid for his family's safety.  In response, the prosecutor told Battle that protection for Battle and his family would be provided.  *Id.* at 68-69.  In a further colloquy, defense counsel renewed the motion for a mistrial.  The court offered to give a curative instruction but defense counsel objected to any curative instruction.  The court then reserved decision on the motion.  *Id.* at 70-72.[3]

During his summation, the prosecutor said of Jeridore:  "I submit to you that he can never go home.  His life is in danger."  Dkt. 14-6 at 37.  Defense counsel immediately objected.  The court sustained the objection and instructed the jury to "disregard that last remark."  *Id.*  Upon completion of the summations, Thomas's counsel renewed the motion for a mistrial based on the previously stated grounds and

---

[3]    The issue also arose on cross-examination of Battle by defense counsel.  When he was asked about "all those benefits" of cooperating, Battle stated "The benefits was to do one year . . . and to have my family safety value [sic]."  Dkt. 14-4 at 134.

added that a mistrial was also warranted because of "the egregious misconduct of the [Assistant] District Attorney," that is, the prosecutor's statement in summation that Jeridore's "life is in danger and he can't go home." Dkt. 14-6 at 43. The court reserved decision. *Id*. at 47.

The jury returned a verdict on July 26, 2002. *Id*. at 127, 142-46. Thomas and Boone were convicted by the jury of attempted murder in the second degree, gang assault in the first degree, assault in the first degree, and the three weapons counts. *Id*. at 142-46; Dkt. 16 at 7-8. Defense counsel renewed their motion for a mistrial. Dkt. 14-6 at 152. The court granted the motion orally, finding that the prosecutor had acted in bad faith in asking Battle the question about other promises, knowing what the answer would be, and then highlighting the matter in summation. The court declared a mistrial, but noted that it was unsure whether the order was with or without prejudice to a new trial and asked for briefing on the question. *Id*. at 163-64; *see also* Dkt. 16 at 8.

On August 20, 2002, the trial court reversed itself, recalling the order declaring a mistrial and reinstating the verdict against Thomas and Boone. Dkt. 16 at 9. The trial court then converted the mistrial motion to a motion to set aside the verdict pursuant to § 330.30 of the New York Criminal Procedure Law. *Id*. In its decision dated October 8, 2002, the trial court granted the motion, setting aside the verdict against both Thomas and Boone, on the basis of the purported *Brady* violations and improper remarks by the prosecutor in summation. *Id*. at 10.

9

b.    *The First Appeal*

The prosecution appealed, and the Appellate Division, Second Department, reversed.  *People v. Thomas*, 777 N.Y.S.2d 673 (2d Dep't 2004).  The Second Department held that the trial court erred with respect to both the *Brady* claim and the claim of prosecutorial misconduct.  It held that the first issue was "not preserved for appellate review, as no objection was made during the trial when the defendants learned of the alleged *Brady* violation."  *Id*. at 674.  It held that the second issue failed on the merits because defendants' objections to the comments in summation "were sustained and prompt curative instructions were given which removed any possible prejudice to defendants."  *Id*.  The court remitted the matter to the trial court for sentencing.  *Id*. at 673-74.  Leave to appeal to the New York Court of Appeals was denied.  *People v. Thomas*, 817 N.E.2d 838 (N.Y. 2004) (Ciparick, *J*.).

c.    *The Sentencing*

On July 26, 2004, Thomas was sentenced, as a second violent felony offender, to determinate prison terms of twenty years each for the assault, gang assault, and burglary counts, fifteen years for the attempted murder count, and one year for each of the weapons counts, all to run concurrently.  He was also sentenced to five years of post-release supervision.  Dkt. 16 at 11.

### d.   *The Direct Appeal*

Represented by new counsel, Thomas filed his direct appeal to the Second Department.  He raised four points.  First, he argued that the prosecution had failed to disclose *Brady* material and engaged in other misconduct.  Second, he argued that the trial court violated his right to due process by delaying its decision on his motion for a mistrial based on the purported *Brady* violation.  Third, he claimed that the trial court violated his right to due process by failing to thoroughly question him about his waiver of his lawyer's potential conflict of interest.  Finally, he argued that his trial lawyer had failed to provide effective assistance of counsel.  Dkt. 13-3 at 10-11.

On August 8, 2012, the Second Department affirmed.  *People v. Thomas*, 949 N.Y.S.2d 634 (2d Dep't 2012).[4]  The court held that the claims of a *Brady* violation and improper comments in the prosecutor's summation were "unpreserved for appellate review, and, in any event, without merit."  *Id.* at 634.  The court also rejected the conflict of issue claim, holding that the trial court adequately explored the matter and that Thomas "knowingly, intelligently, and voluntarily elected to continue being represented by counsel."  *Id.*

---

[4]     Although the Second Department did not rule until 2012, it appears that the appeal was filed in 2004, as the papers show a 2004 Appellate Division index number.  Dkt. 13-3 at 7, 9, 83.

11

Proceeding pro se, Thomas sought leave to appeal to the New York Court of Appeals, raising only his *Brady* claim.  Dkt. 13-4 at 9-15.  On January 24, 2013, the court denied leave.  *People v. Thomas*, 984 N.E.2d 333 (N.Y. 2013) (Pigott, J.).

### 2.   *Proceedings Below*

Thomas filed the Petition *pro se*, raising two claims:  (1) he was denied a fair trial because the prosecutor failed to disclose discovery material favorable to his defense, and (2) trial counsel was ineffective for failing to timely object and/or move for a mistrial based on the prosecutorial misconduct of failing to timely produce favorable discovery material.  Dkt. 1 at 4, 7-11.  In his statement of facts attached to the Petition, Thomas focused on the prosecution's purported failure to disclose, until Battle took the stand, that Battle had been promised protection for him and his family.  He also cites the prosecutor's comments in summation to the effect that Jeridore could never go home because his life was in danger.  *Id*. at 7-11.

The District Attorney's Office filed an affidavit in opposition to the Petition and a memorandum of law on June 2, 2014.  Dkt. 16 at 3, 14.  Thomas filed a traverse on June 25, 2014.  Dkt. 18.  The case was reassigned to the undersigned on May 12, 2023.

12

*DISCUSSION*

**A.   *Federal Review of State Convictions***

As a threshold matter, a federal court may not grant a habeas petition

where the petitioner is in custody pursuant to a judgment of a state court unless the

petitioner "has exhausted the remedies available in the courts of the State," 28 U.S.C.

§ 2254(b)(1)(A), or such process is unavailable or ineffective, *see id.* § 2254(b)(1)(B).   A

constitutional claim is not exhausted until the essential factual and legal premises of the

constitutional claim have been presented to the highest state court capable of reviewing

it. *Bierenbaum v. Graham*, 607 F.3d 36, 47 (2d Cir. 2010); *Galdamez v. Keane,* 394 F.3d 68, 73

(2d Cir. 2005); *see also Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir. 1997).   Additionally, an

applicant is not deemed to have exhausted his state remedies if he has the right under

state law to raise, "*by any available procedure,* the question presented."   28 U.S.C. § 2254(c)

(emphasis added).   If a defendant has a claim of ineffective assistance of counsel, the

claim is reviewable by *coram nobis* to the Appellate Division, *People v. Bachert,* 509

N.E.2d 318, 321-22 (N.Y. 1987), and the defendant may seek leave to appeal to the New

York Court of Appeals from the Appellate Division's denial of the *coram nobis* petition,

*see* N.Y. Crim. Proc. Law § 450.90(1).

"Where a [petitioner] has procedurally defaulted a claim by failing to raise

it on direct review, the claim may be raised in habeas only if the [petitioner] can first

demonstrate either cause and actual prejudice, or that he is actually innocent."

*DiSimone v. Phillips*, 461 F.3d 181, 190 (2d Cir. 2006) (quoting *Bousley v. United States*, 523

U.S. 614, 622 (1998) (internal quotation marks omitted)); *see also Coleman v. Thompson*,

501 U.S. 722, 750 (1991).

   Where a claim is adjudicated on the merits in state court, a federal court

may not grant habeas relief unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857

F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits, the state

court's decision must be accorded "substantial deference."  *Fischer v. Smith*, 780 F.3d 556,

560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was

'so lacking in justification that there was . . . [no] possibility for fairminded

disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting

*Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per

curiam).

   Moreover, "federal courts will not review questions of federal law

presented in a habeas petition when the state court's decision rests upon a state-law

ground that is independent of the federal question and adequate to support the

judgment." *Cone v. Bell,* 556 U.S. 449, 465 (2009) (citation omitted).  That is, federal courts may not review a state court ruling that "fairly appear[s] to rest primarily on state procedural law," so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz,* 497 F.3d 178, 191-92 (2d Cir. 2007) (citations omitted).

New York's contemporaneous objection rule requires a party to object to what he or she believes is a legal error in a trial court's ruling or instruction "at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law § 470.05(2).  "If a state appellate court refuses to review the merits of a criminal defendant's claim of constitutional error because of his failure to comply with such a 'contemporaneous objection' rule, a federal court generally may not consider the merits of the constitutional claim on habeas corpus review." *Peterson v. Scully,* 896 F.2d 661, 663 (2d Cir. 1990) (citing *Wainwright v. Sykes,* 433 U.S. 72, 86-87 (1977)); *see also Harris v. Reed,* 489 U.S. 255, 260 (1989) (explaining that federal habeas review is barred if the constitutional claim was denied by a state court on a state procedural "ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision").  The Second Circuit has held that New York's contemporaneous objection rule "is a firmly established and regularly followed New York procedural rule." *Downs v. Lape,* 657 F.3d 97, 104 (2d Cir. 2011); *see also Garcia v. Franchi,* No. 19-CV-5547, 2020 WL 353099, at *2 (E.D.N.Y. Jan. 21, 2020).

15

II.     *Analysis*

Thomas asserts two claims in the Petition:  (1) the prosecutor failed to disclose discovery material favorable to his defense, and (2) trial counsel was ineffective for failing to timely object and/or move for a mistrial based on the purported prosecutorial misconduct.  Dkt. 1 at 4.  I address each claim in turn.

A.      *The Failure To Disclose Claim*

In his first claim, Thomas argues that the prosecutor failed to timely disclose what was either *Brady* or *Giglio* material, that is, the promise of safety to the witness Battle.  A related but separate argument is that the promise of safety with its implicit suggestion of danger coupled with the prosecutor's improper statements in summation created, as Thomas asserted in his direct appeal, "a highly prejudicial atmosphere of fear and intimidation."  Dkt. 13-3 at 53.[5]  The District Attorney's office argues that the claim is both procedurally barred and fails on the merits.

1.      *Procedural Bar*

The Appellate Division twice concluded that the claim of an alleged *Brady* violation was unpreserved for review.  *People v. Thomas*, 949 N.Y.S.2d at 634; *People v.*

---

[5]     The Petition initially frames ground one as the denial of due process because of the prosecutor' failure to timely disclose discovery material.  Dkt. 1 at 4.  In the attachment to the Petition, however, Thomas discusses the prosecutor's comments in summation and quotes the trial court's statements expressing its concern that the prosecutor had suggested to the jury that the defendants were "dangerous men."  *Id*. at 9.  Consequently, I construe the first claim of the Petition to encompass the argument that the prosecutor's comments in summation also denied Thomas a fair trial.

*Thomas*, 777 N.Y.S.2d at 674.  In its 2012 decision, the Appellate Division also concluded

that the contentions relating to the prosecutor's summation were also unpreserved, 949

N.Y.S.2d at 634, although it did not reach that conclusion in its 2004 decision when it

rejected this contention only on the merits, *see* 777 N.Y.S.2d at 674.  The Court of

Appeals twice denied leave to appeal.

   In my view, whether the procedural bar applies is a close call.  While it is

true that defense counsel did not immediately object when Battle testified on direct

examination about the additional promise, defense counsel moved for a mistrial shortly

thereafter, after the lunch break, and then renewed the mistrial motion twice thereafter.

Dkt. 14-4 at 101-02, 195-97; Dkt. 14-5 at 1; *id.* at 67-72; Dkt. 14-6 at 152-63.  Moreover, the

trial court did not hold that defense counsel had failed to preserve the issue, but

considered the question on the merits.  Indeed, it eventually granted a mistrial and

(after the mistrial order was recalled) a motion to set aside the verdict.  Moreover,

defense counsel did immediately object to the prosecutor's remarks in summation about

Jeridore's life being in danger.  Dkt. 14-6 at 37, 44, 47.

   In any event, I need not decide whether the first claim is procedurally

barred, for I agree with the Appellate Division that the claim fails on the merits.

### 2. *The Merits*

   The state courts here rejected the failure to disclose and related

misconduct claims on the merits, and thus those decisions are entitled to "substantial

deference."  I cannot agree that the ruling "was 'so lacking in justification that there was

. . . [no] possibility for fairminded disagreement.'"  *Vega*, 669 F.3d at 126 (quoting

*Harrington*, 562 U.S. at 103).  Thomas has not shown that the state court's determination

on the merits was contrary to or involved an unreasonable application of clearly

established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).

   In *Brady*, the Supreme Court held that "the suppression by the prosecution

of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or

bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  As the Court

made clear in *Giglio v. United States*, *Brady* applies to impeachment evidence, holding

that "[w]hen the 'reliability of a given witness may well be determinative of guilt or

innocence,' nondisclosure of evidence affecting credibility falls within this general rule."

405 U.S. 150, 154 (1972) (citation omitted); *see also Leka v. Portuondo*, 257 F.3d 89, 98 (2d

Cir. 2001) ("Information coming within the scope of [the *Brady*] principle . . . includes

not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or

innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to

alter the jury's assessment of credibility of a significant prosecution witness." (citation

omitted)); *People v. Fuentes*, 907 N.E.2d 286, 289 (N.Y. 2009) ("Impeachment evidence

falls within the ambit of a prosecutor's *Brady* obligation.").

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *accord United States v. Douglas*, 525 F.3d 225, 244-45 (2d Cir. 2008).

Evidence is "material" where there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kennaugh v. Miller*, 289 F.3d 36, 48 (2d Cir. 2002) (internal quotation marks and citations omitted).  "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).  "He need only show, considering the record as a whole, a *reasonable* probability—and the adjective is important -- of a different result great enough to undermine confidence that the jury would have found him guilty beyond a reasonable doubt." *Fuentes v. T. Griffin*, 829 F.3d 233, 246 (2d Cir. 2016) (internal alterations, quotation marks, and citations omitted).

Here, the additional "promise" of protection was not exculpatory but it was arguably impeaching as evidence of an incentive for Battle to testify -- a promise of protection. But the claim fails, for at least three reasons.

First, there was no obligation on the prosecution to disclose the additional "promise" of protection as part of the discovery in the case. As both Battle and the prosecutor explained, the promise was not made until the week before trial, only after Battle's brother had been approached by individuals on behalf of Thomas offering Battle $3,000 not to testify. It was only after Battle told the prosecutor that he was afraid that the prosecutor assured Battle that the District Attorney's office would provide protection.

Second, the promise was not made to induce an unwilling or reluctant witness to testify; rather, it was a promise to protect a cooperating witness who had already agreed to testify and had already entered into a cooperation agreement. Dkt. 16 at 27; *see People v. Cwikla*, 386 N.E.2d 1070, 1073 (N.Y. 1979) ("The existence of an agreement between the prosecution and a witness, *made to induce the testimony of the witness*, is evidence which must be disclosed under *Brady* principles.") (emphasis added). The prosecution did not bargain for a *quid pro quo* from Battle in exchange for the promise to protect. *See People v. Novoa*, 517 N.E.2d 219, 223 (N.Y. 1987) (The prosecutor's duty to disclose "arises from the fact that the prosecutor and the witness

have reached an understanding in which the witness's cooperation has been exchanged for some *quid pro quo* on the part of the prosecutor.").

Third, even if the additional promise had been disclosed when it was made -- that is, a week earlier -- it is difficult to see what difference it could have made in the outcome of the trial. *See United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) ("[S]trictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.") (quoting *Strickler v. Greene*, 527 U.S. 263, 281(1999)); *People v. Smith*, 30 N.Y.S.3d 432, 434 (4th Dep't 2016) (rejecting *Brady* claim where "it cannot be said that there is a reasonable possibility that the result at trial would have been different had the information been disclosed" (internal quotation marks omitted)). Defense counsel surely would not have cross-examined Battle about his fear of retaliation; indeed, the evidence that the witness might need protection was inculpatory not exculpatory.  I am not persuaded that there was a reasonable probability -- indeed any probability -- that the result would have been any different if the promise of protection had been disclosed a week earlier.

The evidence of Thomas's guilt was strong.  The victim testified in great detail about the attack and who attacked him.  Battle corroborated Jeridore's testimony in substantial respects, including with respect to the details of the attack.  The medical evidence confirmed that Jeridore had sustained many injuries -- that he had been

brutally attacked and tortured.  There was no issue of misidentification, as Jeridore knew all eight attackers; indeed, three of the attackers were his neighbors, one was his cousin, and Jeridore had worked on a daily basis for two months selling drugs for Thomas and his codefendant.  Detective LoPresti also provided corroboration, as Thomas identified several of the attackers, including Thomas, when he was riding with Detective LoPresti in the car.  There was no reason for Jeridore to falsely accuse Thomas and the others of administering the serious injuries he sustained.

As for the purportedly improper statements in summation, they were not about Battle but about Jeridore.  In light of the vicious beating he sustained in his own home at the hands of, among others, neighbors, it was hardly an exaggeration for the prosecutor to say that Jeridore was afraid to go home because he feared for his life.  Moreover, as the Appellate Division noted, defense counsel did object and the trial court sustained the objection and instructed the jury to disregard the remark.  The Appellate Division's determination that the "prompt curative instructions . . . removed any possibility of prejudice to the defendants" is entitled to deference, 777 N.Y.S.2d at 674, particularly in light of the strong evidence of guilt.

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone . . . in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11 (1985).  "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168,

181 (1986) (citation omitted).  "In order to reach the level of a constitutional violation, a prosecutor's remarks must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Whether a prosecutor's improper remarks result in a denial of due process depends upon whether the remarks caused 'substantial prejudice' to the defendant."  *United States v. Tutino*, 883 F.2d 1125, 1136 (2d Cir. 1989) (citation omitted).  Here, as the state court determined, Thomas has not shown any prejudice, much less substantial prejudice.

Accordingly, the claim that the prosecution failed to timely disclose the promise of safety and the related comments in summation do not provide a basis for habeas relief.

### B.  *The Ineffective Assistance Claim*

In the second claim for relief, Thomas argues that "counsel was ineffective for fail[ing] to timely object to and/ or move for a mistrial based upon prosecutorial misconduct for failing to timely disclose discovery material favorable to [his] defense."  Dkt. 1 at 4.  The District Attorney's Office argues that the claim is procedurally barred and fails on the merits.  I agree in both respects.

Thomas raised his ineffective assistance claim in his direct appeal to the Appellate Division.  Dkt. 13-3 at 9, 11, 79.  The Appellate Division did not expressly address the issue (after discussing other issues, including the related *Brady* issue), but

ruled that "[t]he defendant's remaining contention are without merit."  949 N.Y.S.2d at

634.  In his *pro se* application to the Court of Appeals for leave to appeal, however,

Thomas raised only his *Brady* claim and did not raise an ineffective assistance of counsel

claim.  *See* Dkt. 13-4 at 9-15.  Consequently, Thomas failed to exhaust his ineffective

assistance of counsel claim in the state court and he is procedurally barred from raising

the issue now.  *See Smith v. Duncan*, 411 F.3d 340, 345 (2d Cir. 2005) (holding that

petitioner failed to preserve issue for habeas review where he raised issue on direct

appeal to Appellate Division but did not include it in request for leave to appeal to

Court of Appeals); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (same); *see also*

*Bierenbaum*, 607 F.3d at 47 ("We may not consider a state prisoner's application for a writ

of habeas corpus unless the applicant has exhausted available state remedies by 'fairly

present[ing] his claim in each appropriate state court (including a state supreme court

with powers of discretionary review).'" (quoting *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)).

Nor has Thomas shown that his procedural default should be excused for

cause and prejudice or because he is actually innocent.  *DiSimone*, 461 F.3d at 190.  He

has not alleged cause, nor has he shown prejudice.  And the evidence of his guilt, as

discussed above, is compelling.

The Appellate Division's rejection of the claim on the merits is entitled to

deference.  To succeed on a claim of ineffective assistance of counsel in violation of the

Sixth Amendment, a defendant must demonstrate that (1) his attorney's performance

"fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.  To satisfy the first prong -- the performance prong -- the record must demonstrate that "'in light of all the circumstances,' the acts or omissions of [defense] counsel 'were outside the wide range of professionally competent assistance.'"  *United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020) (quoting *Strickland*, 466 U.S. at 690).  "Under the second prong -- the prejudice prong -- a 'reasonable probability' of a different result is a 'probability sufficient to undermine confidence in the outcome.'"  *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 694).

While Thomas's trial counsel did not immediately object when Battle testified that he had been promised protection, soon thereafter counsel did move for a mistrial.  Moreover, as discussed above, there was no *Brady* violation; the information was inculpatory and not exculpatory, and the promise of protection was not made to *induce* Battle to testify as he had already entered into a cooperation agreement.  And even if counsel had objected, there was no prejudice as it is apparent that the outcome would not have been any different.  There was no Sixth Amendment violation and thus the ineffective assistance of counsel claim provides no basis for habeas relief.[6]

---

[6]     Nor would Thomas's claim of ineffective assistance of counsel prevail under New York law, which requires the defendant to show that "counsel failed to provide meaningful representation," *People v. Alvarez*, 125 N.E.3d 117, 120 (N.Y. 2019) (citations omitted), but unlike

## CONCLUSION

Thomas has failed to show a basis for relief under 28 U.S.C. § 2254.

Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of

appealability because Thomas has not made a substantial showing of the denial of a

constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), I certify

that any appeal taken from this decision and order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this

case.  As Thomas has been released on supervision, the District Attorney shall obtain

Thomas's current address from the agency supervising Thomas and mail copies of this

memorandum decision and the judgment to Thomas at that address forthwith.

SO ORDERED.

Dated:      New York, New York
            May 19, 2023

DENNY CHIN
United States Circuit Judge
Sitting By Designation

---

the federal standard, *see Strickland*, 466 U.S. at 694, does not require a showing of prejudice, *id.* at 122-23.  For the reasons set forth above, Thomas cannot show that his counsel failed to provide meaningful representation.

26